Good morning. May it please the court. Jessica Groff for Dana Miller. Your Honors, in the limited time available to me today, I would like to focus on the first issue, the abuse of position of trust adjustment. This case is about honoring the Sentencing Commission's intent to punish more culpable behavior appropriately, and today's issue is resolved through a straightforward application of this Court's decision in United States v. Olesen. There are three reasons why the District Court clearly erred and this Court should remand for resentencing. First, there is no evidence on this record that Dana Miller's position involved professional or managerial discretion. Second, limited supervision without more is insufficient for an adjustment under 3B1.3. And third, there is no evidence that Dana Miller had any substantial education or training to warrant the adjustment as a special skill. Turning to my first point, the abuse of position of trust analysis is a two-pronged test. First, the Court determines whether the defendant occupied a position of trust, and if that is true, the Court goes on to determine whether the defendant used that position to facilitate the commission or concealment of the offense. In defining a position of trust, it's important to start with a plain text of the guidelines. The commentary to 3B1.3 states that a position of trust is characterized by professional or managerial discretion, that is, substantial discretionary judgment that is ordinarily given considerable deference. Counsel, before we get to the guideline calculation, I understand that it was, with the enhancements that you're here today about, it was 51 to 63 months under the guidelines, but the District Judge sentenced a 33-month upward variance to 99 months. Is that correct? Ninety-six months, Your Honor. Ninety-six months, and you're not appealing the upward variance. Is that right? Just the two enhancements in the calculation? Correct, Your Honor. Okay. All right. Your Honors, this Court in Ollison expanded on the meaning of professional or managerial discretion within the position of trust enhancement. And this Court held that the colloquial understanding of a position of trust is that an employee that is trusted to do their job and not to steal is not what is encompassed under 3B1.3. Rather, position of trust is a term of art. But that colloquial definition is exactly what the District Court adopted in this case. We can see from page 130 of the record. It's stated in the PSR, Miller was known as a trusted employee, which allowed the scheme to continue for 21 months. But that reasoning was directly rejected by this Court in Ollison. This Court explained that professional or managerial discretion means complex, situation-specific decision-making that is given considerable deference. Well, let me, well, first of all, this is a factual finding, right? Correct, Your Honor. All right. So it's a limited standard of review. But what Ollison is saying here is, absent proof of other aggravating circumstances, we do not think the enhancement should apply to a secretary who made unauthorized charges on a credit card that was issued to 1,200 other employees. Ollison's fraud is the modern-day equivalent of an ordinary bank teller who was pilfering money from the till. Now, don't you think, I mean, isn't it reasonable to say that the District Court thought that Ms. Miller, who's the payroll supervisor or the, the principal check-writing person at her company, is in a much more responsible position than someone with a corporate credit card? No, Your Honor. And we can see that from the record in this case on page 121, where it lists the job responsibilities of Ms. Miller. She was the accounts payable clerk, and her primary duties included inputting data into the computer, printing checks, bringing them to her supervisor to review and sign, and then copying those checks to send to the bank. And Ollison, this Court, focused on the fact that there was no professional or managerial discretion and specifically explained that there is a heightened standard and that some discretion alone will not suffice. What was the review when you just mentioned the supervisor reviewed? Was that reviewed as to amounts or as to vendors or to everything? It seems like she had, this went on for a to the tune of over a couple million dollars, if I'm not mistaken. What was the review, what was involved in this review that you're relying on to defeat her discretion? Your Honor, the record isn't clear as to what was reviewed by a manager, but what we are relying on to refute the discretion is the fact that nowhere in this record does it state that Dana Miller had the discretion over any of her job functions. She had specific duties that she was required to do, including inputting data, printing the checks, and sending them to the bank. But there is no evidence that she had that complex situation-specific decision making that she made decisions that others would defer to. She did it for bona fide vendors who either sold materials or provided services. Wasn't it part of her job to receive invoices and prepare checks to pay those with whom the company did business? It was, Your Honor. And one of them was a fictitious payee in the form of her then-boyfriend, is that correct? That's correct. Okay. But that does not indicate discretion. For example, Dana Miller did not have the right to decide what vendors to use. Dana Miller did not have the right to decide how much to pay those vendors. She had specific clerical duties that did not rise to the level of the substantial discretionary judgment that this court required in Ollison. Now, the defendant in Ollison did have some discretionary functions. She had this company credit card that she was allowed to make purchases on in certain categories for the school district, and then she abused that by making personal purchases. But this court noted that limited purchasing authority cannot be described as substantial discretionary judgment. And in further delineating this distinction between professional or managerial discretion and positions that don't have it, this court heavily quoted from and embraced the reasoning of the D.C. Circuit case United States v. Tan. And Tan, the job functions of that defendant were directly quoted by this court in Ollison, and they are almost identical to that of Ms. Miller. Tan was an office manager, and she managed the expenditures, prepared checks for signature, maintained a computerized check ledger, and reconciled monthly statements with that ledger. And we can see on page 121 of the record that that is almost identical to what Ms. Miller did. But the D.C. Circuit noted that because there were no findings of discretion by the district court, nothing indicated that she had the right to make these judgment calls. That was not sufficient under 3B1.3. What about in the 28J letter, I think there's some mention of United States v. Brown, the Fifth Circuit opinion from 1993, and the argument made was that the amendment 492 did not abrogate that prior jurisprudence. How do you respond to that? Your Honor, amendment 492 did limit Brown's authority now because amendment 492 added that professional or managerial discretion language to the guidelines. So the main focus of this court in Brown was on the limited supervision of the defendant in that case. And that is still relevant to the analysis, but because there is no explanation or consideration of professional or managerial discretion in Brown, it is limited in its application under the modern guidelines. Let's come back to the standard review. In response to Judge Jones' question, acknowledge, I mean, it's a factual inquiry, right? Correct, Your Honor. So in each of these cases, the facts are always going to be slightly different. I would spot you that in Tan, it looks a little closer here, but every case is different. The point being, it's a factual determination, so even if the district court's determination doesn't line up exactly like every other case, as they typically don't, it's more difficult to say it's just absolutely clear error not to get there because our cases have said it's not the title, right, that matters. So our precedent says it's not the title the person has, it's a factual inquiry into the duties, et cetera, right? So given the standard review, you know, what's the pronouncement that this is just clear error, totally out of sync, you know, with the precedent? Your Honor, this case is a straightforward clear error determination, and I would have two reasons to respond to that question. First, we can see on the record, page 130, that the PSR stated Miller was known as a trusted employee, and the PSR was adopted by the district court, and that particular analysis was rejected by this court in Ollison because it had no finding of professional or managerial discretion. And second, we can see on the record, page 101, at the sentencing hearing, that the district court misconstrued Ollison. The district court said Ollison was more about the second prong, whether the person abused that position to commit or conceal the offense. But we can see that Ollison gives the greatest explanation from this court on the first prong, that professional or managerial discretion. So because there are no findings on this record, no evidence to indicate that Ms. Miller had discretion, period, in her job, much less professional or managerial, this is an easy case of clear error. That finding is simply not present on this record, and the evidence is simply not present. Turning to my second point, the government and the district court focused heavily on the fact that Ms. Miller was not a closely supervised employee, and we readily concede that she was not. But again, this court in Ollison pointed out that lack of supervision is a feature, it's an element of a position of discretion. And I think it's important to really understand why the guidelines are targeting positions with this professional or managerial discretion as more culpable behavior, and this court explained that perfectly in Ollison, stating that positions of trust which involve complex situation-specific decision-making are given considerable deference precisely because they are so hard to oversee. They cannot be dictated by or monitored against established protocol. So people in these positions are expected to make essentially judgment calls when there may be more than one legitimate course of action, and those types of judgment calls, those types of decision-makings are difficult to monitor when compared to non-discretionary jobs where a person is supposed to complete specific job functions. And this is also evident from the examples given in 3B1.3 for a position of trust, one of which is that an attorney serving as a guardian who embezzles from the client would be abusing a position of trust. So that attorney is acting as a fiduciary, he's expected to act in the best interest of his client, expected to make decisions when there may not be specific answers of exactly what that attorney could do, and that is something that we give great deference to, and when that particular type of trust is abused, that is what the guidelines say a two-level increase as an abuse of position of trust. So there's a specific reason that the guidelines are targeting these types of jobs, but we can see from the record that Ms. Miller did not have that type of position. There is no evidence of any discretion whatsoever. And this court rejected a similar argument last year in United States v. Ventilay. In that case, a postal worker was stealing from the post office, and the government argued that because the post office had lax auditing procedures, the employee was given the professional discretion to audit himself. This court rejected that argument, noting that lack of supervision is a necessary but not sufficient basis for imposing the position of trust adjustment. So while we, of course, concede that Ms. Miller was not a closely supervised employee, that is only one part of a position of trust analysis. There still has to be that professional or discretion that is stated in the plain text of the guidelines and as this court interpreted in Oleson. Turning to my third point, there is also no evidence that Ms. Miller had a special skill such that she warranted the adjustment. Now we can see from the guidelines Of course she did. In other words, in this case, the skill had to do with being capable of using the company's software in order to pay its bills. She did learn how to do her job, Your Honor. That's right. But if that were the case, then every employee would be getting this adjustment. That's certainly not true, because her special skill involved the payment of the company's bills. Your Honor, the company doesn't make available to every employee the ability to get into the financial software. But, Your Honor, the guidelines require evidence of substantial education or training, and the examples given are pilots, lawyers, accountants, and chemists, things that require that extra level of education. Ms. Miller did learn how to do her job, and that was a clerical position. But the guidelines are not intended to apply to every employee who learns how to do their job. There is a distinguishing point of people who are abusing education or training that most people do not have. And we can see on page 136 of the record. I know a lot of people who don't have that education or training. I see that I'm running low on time. Could I answer your question? Sure. That's correct, Your Honor. A lot of people don't know how to do bookkeeping, but that still doesn't rise to the level of substantial education or training under the guidelines. Anyone who was given Ms. Miller's position would learn to do their job. Anyone in any position is going to learn to do their job. But what the guidelines are targeting is that substantial education or training that the general public doesn't have. But if this Court were to apply it here, it would mean that any clerk who learned to use the company computer would warrant the adjustment, and that would not be in line with the guidelines. So for those reasons, we would ask that this Court reverse the remand for resentencing. All right. Thank you. You've reserved your time for rebuttal. Ms. Hayworth? May it please the Court, Gail Hayworth on behalf of the United States. Now, this guideline dispute can be readily resolved based on the clear error standard of review and the deference this Court gives to the fact findings of the district court, turning first to the position of trust enhancement. Miller fails to show clear error in the district court's finding that she occupied a position of trust because it was not implausible for the district court to find that she exercised substantial discretionary judgment that was given considerable deference. She was an accounts payable clerk at a small company, and in that role she was described as a trusted employee with limited supervision. Do you agree with the district court's analysis of Olison, or do you sort of take a different view on why we should affirm? Well, Olison is distinguishable because in that case it was a secretary for the Dallas ISD who had limited discretionary authority to make small purchases, and purchases essentially snacks for the office, and to do so she was given a company credit card or a procurement card that was also given to 1,200 other employees. Miller, in contrast, had the authority to verify and report substantial sums of money, and there is no evidence that her authority was given to many other employees, nor would it make sense to give her authority to make entries into the accounting books and to tell the bank which checks to pay to many other employees. What about the facts in Tan? I think Tan is cited by this circuit in the Olison opinion. What about the facts in that case? They seem a bit more analogous. It is a bit more analogous, but Miller's authority and her autonomy far exceed that in Tan's. Tan was an office manager who basically kept track of the checks in a check ledger, but there was no indication that she was reviewing invoices, no indication that she had free reign to the company's accounting system, and no indication that she had the authority to represent the company in telling its bank, here are our legitimate checks, pay them when they're presented. Moreover, there was no deference to her decision making, if there was any decision making by her in that case, because her supervisors were supposed to review the check ledgers, and they did review the check ledgers, and when they did, that's how they discovered her fraud. Isn't that the argument here, is that everything went through the supervisor? It was nominal review. He wasn't checking the background documentation, the backup documentation. They were deferring to her judgment that there was sufficient documentation to support a certain payment to a certain vendor. She had unchecked authority to enter payments into the accounting system based on, and you can infer that she was reviewing invoices, not only from her position as an accounts payable clerk, which implied in that is that she's reviewing vendor invoices, but also the fact that her supervisor, when he confronted her, asked her why, pointing to the stand of her payments, why is there no backup documentation to them, which suggests not only that there should have been backup documentation, but that she should have been, she should know about it and been reviewing it. Within the system, the way I understood it, she wrote the fraudulent checks and interspersed them within checks that were bona fide, correct? That's correct. And so handling them that way, so when she wrote the check to her boyfriend or whoever, they were mixed in with other legitimate checks. 80 to 100 other legitimate vendor checks going out per week, yes. So within that scheme, I take it you're saying there is or was no oversight or nobody else would see that flow of transactions, is that the case? It was not. Nobody down the line, so to speak, who would be reviewing this, as long as facially there were some that were legitimate, you know, it just sort of went on through, is that? Correct. They were deferring to her judgment that there was sufficient documentation to support every payment entered into the system. Her supervisor, no one else was checking to make sure there was sufficient documentation. Do I understand correctly, did she receive paper invoices and then she put those into the system? In other words, they would deliver the mail to her which constituted the bills or the, you know, she had obviously a list of the employee payroll, but you see what I'm saying? She had to process the paper. Right. It's not in the record as far as what specifically the documentation looked at. I can tell you if you are interested in knowing, not on the record, but based on the record it just appears that there's backup documentation that's been supporting the vendor. But, I mean, she was responsible for the backup documentation. Yes, for reviewing it, and that would be the basis for why she's entering a payment into the system. Did the PSR say anything about how she could have flagged irregular looking documentation? Well, if somebody sent an invoice for a million dollars for something that she didn't think the company, you know, for bouncy houses or something, she wouldn't just automatically prepare a check, would she? Or do you know? I mean, the PSR doesn't say anything about that, but it seems to be implicit in her job as far as making sure they're reviewing invoices and then making payments on them. Within the flow, on the bona fide ones, there was an invoice from which a bona fide check was made, and that was deposit, right? Right. So the one she wrote, all it was was just a check, right? I mean, there was no backup documentation. There's no backup documentation. Just the check that she put in between. Correct, correct. And whatever she put in the accounting system to say this is a vendor payment, he's applied to sell. The bona fide invoices come from somewhere else, right? I mean, they come to her, correct? Correct. All right, so if a non-invoice transaction came to her like what she did, in her position would it not have been her duty to have detected that there was no invoice and to not have paid it? Correct. So she was, quote, entrusted with processing based on invoice, et cetera. In other words, if the phony check she did, if they came to her in the regular scheme, she would have been duty-bound not to have paid it because there would have been no invoice or substantiation, correct? Correct. I mean, based on what her supervisor said to her, if there was insufficient documentation, it should not have been entered into the system. Now Miller, she also had unsupervised authority to represent the bank in telling, I mean, her company in telling the bank, these are our legitimate checks. We've issued them. Please pay them on presentment. I mean, in this way she acted as a fiduciary on behalf of the company in informing the bank which checks the company had issued so as to ensure only legitimate checks would be paid. And she exploited both these aspects of her job, both her unchecked authority to enter vendor payments into the accounting system and her unsupervised authority to tell the company's bank which checks it should pay to steal $2.2 million over the course of 21 months, and she stole it without detection. The very fact that she was able to steal so much for so long without detection suggests that she had a position of trust. About jewelry, what do you call it? Jewelry, trucks, et cetera. Yes. And plastic surgery. Plastic surgery, correct. Okay. Was she also doing payroll as well in addition to third-party vendor payments? She did do payroll as well. Which the fact that she could steal so much and escape detection for so long shows that she had way more trust than the typical average ordinary bank teller or hotel clerk. And this is especially true here considering that even when the company knew it was losing money and that something was wrong, they did not think to check or audit her. It wasn't until she exposed herself with her extravagant spending that they went and finally audited her and found that there was not supporting documentation for the Sandifer payment. I thought it was the bank that raised the question. It was the owners. They kept losing money and they didn't know why. They couldn't figure it out. And then they started becoming suspicious of her cars that she was coming in, her plastic surgery, and they were wondering where is she getting this money. And so then they did an audit of the checks and saw that there was no supporting documentation as well as that the checks were forged. Went over Bentley up to the front door in the employee parking lot and got out in her Gucci shoes and went to work. I'm being facetious. There's no answer required. Not trying to make light of it, but when I read the brief, that's what I was visualizing, driving up instead of your pickup truck into Bentley and parking in the lot, coming in with the Louis Vuitton bag, with the Louboutin shoes, with the red bottoms. Very discreet. Anyway, I'm taking away your argument. They have a hard time with restitution, huh? Yes. Anyway, carry on, counsel. So Miller's case is much more like Beecraft, which Tan distinguished, in which the defendant submitted false purchase orders which were accepted without question. And her case is much closer to Tio Jonko, which was the case cited by Olison for its standard of complex situation-specific decision-making, where a position of trust is in an organizational setting where supervisors defer to lower-level decision-makers because they have firsthand knowledge of the facts based on document review. And that's exactly what Miller was here. She was a lower-level decision-maker with firsthand knowledge of the facts based on her review of the invoices and the company deferred to her. They deferred to her for 21 months despite significant losses. So based on that record and based on the deference accorded to the district court's fact-finding, she cannot show clear error in the district court's finding. Now, turning to the sophisticated means enhancement, because it was not directly addressed, I will refer you to my brief on that. All right. I think we have. Yes, you're referring. Thank you. All right. Back to you, Ms. Griff. If you like. Your Honors, there is no question here that Dana Miller committed a crime. There is no question that she stole a considerable amount of money, and there is no question that that loss amount was included in her guidelines. But the issue here is whether she meets the definition of holding a position of trust. And what you have not heard from the government is anything about professional or managerial discretion. What we've heard from the government is that she took a lot of money and she wasn't supervised. But that is exactly what this court rejected in Ollison and Veneley. This court specifically noted that a lack of supervision is not sufficient for a position of trust. We still have to start with step one, professional or managerial discretion. Now, the government has noted that she had some discretion or some authority to make representations to the bank. But we can see exactly what that was on page 121 of the record. She printed the checks, took them to her manager to review and sign, made copies of the checks that her manager signed, and sent that to the bank. In no way is she acting as a fiduciary on behalf of the company. Rather, she is following specific steps that she is expected to do. And that is not indicating that she has authority over those checks, considering that she wasn't allowed to sign them, was not allowed to determine which vendors to use, was not allowed to determine how much to pay those vendors. There is a distinction here based on that professional or managerial discretion that we have to go back to the plain text of the Guidelines 4. Your Honors, this offense did go on for 21 months, and the government is using that to suggest that that must be because she had authority or discretion. But that still needs to be supported by the record. The facts of this case were undisputed at the district court. Her job responsibilities were undisputed. So if I had sent an invoice into the company, you're saying that I wanted some money and I'm just a devious third party, you're saying she would have had to write a check? No, Your Honor. I'm saying that if she flagged something like that, that is not evidence of substantial discretionary judgment. To me it is, because otherwise, you know, if it turned out it was a legitimate charge and she's holding up payment, that could interfere with company relations with third parties. Your Honor, this court— Because it was their lawyers, heaven forbid. Your Honors, this court noted in Ollison that some discretion, some judgment is not— Ollison is not. I mean, on the facts, I agree with the other colleagues. Tan is a different case. Ollison is a real weak case to me, because all she was supposed to do was purchase a few office supplies with her business credit card. She was supposed to purchase office supplies and arrange catering events, as noted in the opinion, and choose caterers and decide how those were run. But this court— Yeah, for her boss in one office. But the purpose of us relying so heavily on Ollison is not simply the facts of that case. It's the analysis that this court did. This court noted professional or managerial discretion, and this court defined that. Complex, situation-specific decision-making that has given considerable deference. So if Ms. Miller had some small decision-making authority, that is not sufficient under this court's analysis in Ollison. But the record here has no evidence that she had decision-making authority. And, in fact, when we objected at the district court, the government came back, and we can see on page 153 of the record, they did not point to any decision-making authority. They did not point to any substantial discretionary judgment, and, in fact, conceded that it was a close call. So with the facts on this case, clear error is obvious here. There has to be a finding of substantial discretionary judgment that has given great deference. That is completely lacking in this case. The lack of supervision on its own, as this court explained in Ollison, is not sufficient. This court should start with the plain text of the guidelines, professional or managerial discretion, and, as this court explained in Ollison, by citing TAN, an office manager who is responsible for managing some expenditures, is not sufficient. There must be that finding of discretion, and that is lacking in this case. So we would ask this court to reverse. All right. Thank you, Ms. Graff. That's our able briefing and argument on behalf of your client, Ms. Sayward. Thank you on behalf of the government. The case will be submitted. We call up the second case, Providence Behavioral Health.